UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                        Case No. 04-20049-3-BC
                                                          Honorable Thomas L. Ludington

v.

BARBARA J. WALLACE,

        Defendant.
_____/

## SENTENCING MEMORANDUM

Defendant Dameon White-Baber, a resident of Los Angeles, California, received a prescription for the painkiller OxyContin to treat his advancing case of sickle cell anemia. Defendant Barbara Jean Wallace, White-Baber's friend, who also resided in Los Angeles, agreed to assist White-Baber in selling some of the OxyContin pills to Wardell Amos, who resided in Saginaw, Michigan. On January 26, 2005, White-Baber and Amos were both charged in a multi-count indictment in the Eastern District of Michigan for conspiring to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. [Dkt. # 19]. When the fourth superseding indictment was filed on September 20, 2005, Wallace was also charged in Counts 1, 2, 7, 8, and 30.

Amos and White-Baber elected to plead guilty and waived their right to a jury trial. Amos and the government entered into a Rule 11 agreement that reflected a guideline range of 188 to 235 months. [Dkt. # 49]. The Honorable David Lawson, on February 7, 2006, sentenced Amos as a career offender under United States Sentencing Commission Guidelines Manual ("U.S.S.G.") § 4B1.1(a) to 188 months in prison for her participation in the drug distribution activities.

White-Baber also entered a guilty plea to all of his pending charges, but without the benefit of a Rule 11 agreement, and was sentenced by Judge Lawson on December 18, 2006. White-

Baber's counsel sought a downward departure from the guideline range of 63 to 78 months because White-Baber suffered from an extraordinary physical impairment pursuant to U.S.S.G. § 5H1.4. White-Baber's presentence report and the transcript of the sentencing hearing are not part of the record in this case. However, in an effort to comply with the Court of Appeals directions on remand, a copy of the presentence report, and Judge Lawson's statement of reasons was located and reviewed. The presentence report reflects that White-Baber's health was not good as he had been diagnosed with sickle cell anemia "at nine months," as well as necrosis in his hips and left shoulder. Judge Lawson sentenced White-Baber to 36 months in custody, reflecting a 27 month variance. The statement of reasons reflected his decision that "[a] sentence within the advisory guideline range would be greater than necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a)." According to the online Bureau of Prisons Inmate Locator, White-Baber was released from custody on November 4, 2009. He died eight days later on November 12, 2009.

Defendant Wallace took a different approach than her co-defendants. She rejected the government's offer of a plea agreement and proceeded to trial on December 5, 2006. Wallace's case was reassigned from the Honorable David Lawson to the Honorable Thomas L. Ludington after Judge Lawson moved his chambers to Detroit. [Dkt. # 79]. Judge Lawson retained responsibility for Amos and White-Baber.

After hearing the evidence presented by the government and Defendant Wallace, including her own testimony, the jury was unable to reach a unanimous verdict and a mistrial was declared on December 13, 2006. The mistrial was followed by a sixth superseding indictment on February 28, 2007, which included the five drug trafficking charges from the fifth superseding indictment and added two counts for willfully testifying falsely under oath during the trial in December of 2006,

in violation of 18 U.S.C. § 1621(1). [Dkt. # 100].

At an April 5, 2007 final pretrial conference, the government's attorney, Wallace's attorney, and the Court undertook considerable efforts to be sure that Wallace understood her circumstances and was making a good decision regarding a plea agreement. Nonetheless Defendant Wallace once again rejected the government's plea offer with a guideline range of 33 to 41 months and proceeded to trial a second time. A second jury returned guilty verdicts on Counts 1 through 7 of the sixth superseding indictment on May 18, 2007. [Dkt. # 116].

Defendant Wallace was sentenced on September 19, 2007 to 78 months in custody. [Dkt. # 120]. Her guidelines were correctly scored at 78 to 97 months. Defendant Wallace successfully appealed her sentence. The case is now back before this Court on remand for resentencing, the initial sentence having failed plain error review. *See United States v. Wallace*, 597 F.3d 794 (6th Cir. 2010). The central concern of the Court of Appeals in remanding the case for resentencing was the absence of a judicial response to Defendant Wallace's counsel's "argument" during her sentencing hearing that she should not receive a sentence longer than White-Baber because he "played a much larger part in the conspiracy," *id.* at 802, or, stated another way, "why sentencing Wallace to twice as long as White-Baber was appropriate." *Id.*

The government's attorney explained at the second sentencing hearing, as she did at the first, Sentencing Tr. at 18–19; [Dkt. # 124], that the difference between Wallace's guideline range and White-Baber's guideline range was a product of White-Baber's willingness to accept responsibility for his conduct (a three-level reduction for White-Baber) and Wallace's unwillingness to do so, and the fact that the jury concluded that Wallace lied under oath on two occasions during the first trial (a two-level increase for Wallace). Finally, White-Baber was dying of an incurable disease. Indeed,

these facts were uncontested by the defense at both the first and the second sentencing hearings.

Defendant Wallace was committed to the custody of the Bureau of Prisons for a term of 78 months on each of Counts 1 and 5, 48 months on Counts 2 and 4, and 60 months on Count 6 and 7 at the August 10, 2010 sentencing hearing,.

This sentencing memorandum is intended to address why this Court's effort at the first sentencing hearing, and perhaps the second, to respond to the Defendant's sentencing "disparity" argument may be viewed as abbreviated. Importantly, the legal question this Court is being asked to address is why the sentence imposed on Defendant Wallace at the low end of her guideline range is not disparate when compared with the sentence imposed by Judge Lawson on White-Baber. That is true even though Defendant Wallace's sentence, as a guideline sentence, is presumed to be reasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007); *Rita v. United States*, 551 U.S. 338, 347–51 (2007); *United States v. Herrera-Zuniga*, 571 F.3d 568, 582 (6th Cir. 2009); *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). Indeed, this is true notwithstanding the fact that § 3553(a)(6), which requires the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," does not apply to co-conspirators. *United States v. Conaster*, 514 F.3d 508, 521 (6th Cir. 2008).

Ultimately, the answer to the question is that generally the guidelines furnish reliable criteria to avoid unreasonable disparities between different defendants, and specifically, Defendant Wallace does not offer any substantive criticism of the guidelines to the contrary in her case. Nothing more, in this Court's view, needs to be said. However, to the extent this Court is being asked the question on remand, it is not my personal opinion that the Sentencing Commission's guidelines reached a substantively unreasonable recommendation in arriving at a range of 78 to 97 months for Defendant

Wallace. Some history is in order to explain those conclusions.

I

In November 1971, U.S. District Judge Marvin E. Frankel of the Southern District of New York began a series of lectures at the University of Cincinnati Law School criticizing the indeterminate sentencing system then used in federal courts. *See* United States Sentencing Commission, Fifteen Years of Guideline Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform, at 4 (Nov. 2004), *available at* http://www.ussc.gov/15_year/15_year_study_full.pdf (hereinafter "U.S.S.C. Report"). He called for a series of reforms, including the creation of a sentencing commission to study sentencing issues and formulate guidelines to govern federal criminal sentences. *Id.* In 1973, the lectures gave rise to a book, *Criminal Sentences: Law Without Order*, that became the "best known attack" on the federal sentencing system and laid the groundwork for a torrent of criticism in the second half of the 1970s. Marc L. Miller & Ronald F. Wright, *Your Cheatin' Heart(land): The Long Search for Administrative Sentencing Justice*, 2 Buff. L. Rev. 725, 726 (1999).

Critics of the indeterminate system focused on its ineffectiveness and the fact that people with similar criminal histories who were convicted of similar offenses but were sentenced by different judges often faced starkly different sentences. *See* D. Michael Fisher, *Striking a Balance: The Need to Temper Judicial Discretion Against a Background of Legislative Interest in Federal Sentencing*, 46 Duq. L. Rev. 65, 68 (2007). Indeterminate sentencing rose in popularity as a way for judges to fashion individualized sentences for individual offenders and promote rehabilitation and reform. *Id.* But it did not work that way. Prison had little rehabilitative effect and recidivism rates remained high. *Id.* (citing Robert Martinson, *What Works? - Questions and Answers About*

*Prison Reform*, 35 Pub. Interest 22, 49 (1974)). More importantly, the dramatic difference in sentences for similar offenses and offenders diminished respect for the judicial branch and gave rise to the impression that criminal sentencing depended less on the offending conduct than on the judge making the sentencing decision. *Id.* at 68–69 (citing sources).

Ultimately, the criticism from attorneys, legislators, scholars, and the public prompted congressional action. *See United States v. Booker*, 543 U.S. 220, 292 (Stevens, J., dissenting) ("In the mid-1970's, Congress began to study the numerous problems attendant to indeterminate sentencing . . . . Congress in 1984 decided that the system needed a comprehensive overhaul."). In 1975, Senator Edward Kennedy introduced S. 2699, a bill that would have formed the U.S. Sentencing Commission and reduced the maximum sentences and mandatory minimums proscribed by many statutes. U.S.S.C. Report at 4. The bill, like its many successors would be in the next nine years, was unsuccessful. However, in 1984, attached to an appropriations bill, the Senate passed the Comprehensive Crime Control Act of 1983, which included a sentencing reform bill authored by Senator Kennedy. *Id.* at 5. Despite some disagreements, a complimentary version of Kennedy's bill passed in the House of Representatives as well. The Sentencing Reform Act of 1984 was signed into law by President Ronald Reagan on October 12, 1984. *Id.*; *see* 18 U.S.C. §§ 3551–3742; 21 U.S.C. §§ 991–998.

The bill created an "independent commission" to oversee federal sentencing within the judicial branch, consisting of seven members appointed by the President with the advise and consent of the Senate. 28 U.S.C. § 991(a). The commission was charged with establishing "policies and practices" for federal sentencing designed to meet the purposes of sentencing described in 18 U.S.C. § 3553(a)(2) and

> provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices[.]

28 U.S.C. § 991(b)(1)(A–B). The statute also directed the commission to establish sentencing practices that "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1)(C). Moreover, the guidelines were not meant to be static. Congress directed the Commission to periodically review and revise the guidelines based on the comments and criticism of the public and other stakeholders. 28 U.S.C. § 994(o).

Although the statute identifies several goals, "[t]he elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim." *Booker*, 543 U.S. at 292–92 (Stevens, J., dissenting) (citing Kenneth R. Feinberg, *Federal Criminal Sentencing Reform: Congress and the United States Sentencing Commission*, 28 Wake Forest L. Rev. 291, 295–96; Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent'g Rep. 180 (1999)). As one of the scholars cited in Justice Stevens' *Booker* dissent explains, "grossly dissimilar criminal punishment" was the "primary reason" senators like Kennedy, Gary Hart, Howard Metzenbaum, and now-Vice President Joe Biden promoted the statute. Feinberg at 295–96. "Quite frankly, all other considerations were secondary." *Id.* at 296.

The guidelines issued by the commission in 1987 provided concrete answers to sentencing questions for more than a decade. The guidelines required sentencing judges to make findings on a series of factors, such as criminal history, drug quantities, currency amounts, and whether a firearm was involved, and impose a sentence within the mandatory range outlined in the guidelines manual.

-7-

The guidelines limited the discretionary sentencing power of individual judges, but, in most cases, substantially increased nationwide uniformity of sentences. Offenders who engaged in similar behaviors usually received similar custodial sentences, no matter which judge was assigned to the case.

**II**

The efforts at addressing sentencing disparity hit a largely unexpected roadblock on June 26, 2000, when the U.S. Supreme Court issued its opinion in *Apprendi v. New Jersey*. The Court concluded that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000). The decision escalated questions about the constitutional validity of the guidelines for reasons completely unrelated to the guidelines' efforts to address sentencing disparity.

Charles C. Apprendi, Jr., fired several bullets into the home of an African American family in Vineland, New Jersey at 2:04 a.m. on December 22, 1994. *Id.* at 469. He was arrested an hour later. *Id.* During questioning, he admitted firing the shots into the home and stated that even though he did not know the family that owned the home, he fired the shots because they were "black" and he did not want them in what had been an all white neighborhood. *Id.* He was charged in a 23-count indictment and ultimately pleaded guilty to three counts, including possession of a firearm for an unlawful purpose on the night of the shooting. *Id.* at 469–70. Pursuant to New Jersey law, possession of a firearm for an unlawful purpose was a second degree felony punishable by five to ten years in prison. *Id.* If, however, a second degree felony was committed "with a purpose to intimidate an individual" because of race or color, a separate statute not mentioned in the indictment

or guilty plea extended the term to ten to twenty years in custody. *Id.* at 470. After Apprendi entered his guilty plea, the trial judge, sitting without a jury, found by a preponderance of the evidence that Apprendi had acted with a purpose to intimidate because of race or color and sentenced Apprendi to twelve years in prison on the possession of a firearm for an unlawful purpose charge. *Id.* at 471. A divided New Jersey Supreme Court affirmed the sentence and conviction. *Id.* at 472–74.

The U.S. Supreme Court reversed Apprendi's sentence, concluding that the sentence violated Apprendi's Fourteenth Amendment right to due process and Sixth Amendment right to a jury trial because the maximum sentence authorized by the statute was increased based on a fact found by a judge by a preponderance of the evidence. *Id.* at 476–77, 490. The Court emphasized that *any* fact that increases the maximum sentence authorized by a statute must be presented to a jury and proved beyond a reasonable doubt. *Id.* at 490.

Four years after *Apprendi*, the Supreme Court extended its reasoning to the mandatory sentencing guidelines employed by Washington State at that time. *Blakely v. Washington*, 542 U.S. 296 (2004). In *Blakely*, the defendant, Ralph Howard Blakely, Jr., pleaded guilty to second degree kidnaping involving domestic violence and the use of a firearm. *Id.* at 298–99. Under Washington law, second degree kidnaping was a class B felony punishable by a maximum of ten years in prison. *Id.* at 299. However, the state's mandatory sentencing guidelines prescribed a custodial sentencing range of only 49 to 53 months based on Blakely's conduct and history. *Id.* Accordingly, based on the facts Blakely admitted at the plea hearing, the maximum sentence he could have received was 53 months. At sentencing, the judge indicated that he intended to sentence Blakely to 90 months in prison on the ground that Blakely had acted with "deliberate cruelty," which was a statutorily

enumerated reason for departure from the mandatory guidelines in cases involving domestic violence. *Id.* at 300. After Blakely objected to a three-year increase in the maximum sentence, the judge held a three-day evidentiary hearing and issued 32 findings of fact, affirming his initial conclusion that Blakely acted with deliberate cruelty and sentencing him to 90 months in custody. *Id.* at 300–301.

The Supreme Court reversed again. The Court emphasized that if the trial judge had sentenced Blakely to 90 months based solely on the facts admitted in his guilty plea, the sentence would have been reversed by the state appellate courts because it was outside the mandatory guideline range. *Id.* at 303–04. The sentence Blakely actually received required the judge to rely on facts not admitted by the defendant or proved beyond a reasonable doubt to the jury, and consequently violated Blakely's Sixth and Fourteenth Amendment rights. While mandatory minimums based on judicially-found facts are permissible as long as the statutory maximum does not increase, *McMillan v. Pennsylvania*, 477 U.S. 79, 81 (1986), and indeterminate sentencing systems that grant judges wide discretion are constitutionally acceptable, *Williams v. New York*, 337 U.S. 241, 242–43 (1949), if a state establishes a maximum sentence by statute, the offender's sentence may not exceed that maximum based on judicially-found facts. *Id.* at 304–05. Other than an earlier conviction, any fact that can increase the maximum punishment imposed on a criminal defendant must be proved to a jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 499.

In her dissent, Justice O'Connor, joined by three other justices, predicted that the Court's decision would mean the end of the guideline systems employed by "numerous" other states and the federal government. *Blakely*, 542 U.S. at 323–25 (O'Conor, J., dissenting). She emphasized her view that the *Blakely* decision "casts constitutional doubt over them all and, in so doing, threatens

an untold number of criminal judgments." *Id.* at 323. She noted that the federal guidelines, although unlike Washington's guidelines in that they were promulgated by an administrative agency located in the judicial branch and not the legislature, permitted judges to increase the maximum allowable sentence based on judicially-found facts. She concluded, "[w]hat I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost, and tens of thousands of criminal judgments are in jeopardy." *Id.* at 326.

In a case argued the next term—four months after *Blakely* was issued—a divided Court concluded that *Blakely*'s rationale applied to the U.S. Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220 (2005). In *Booker*, one five-justice majority, composed of Justices Stevens, Scalia, Souter, Thomas, and Ginsburg, concluded that any fact other than a prior conviction necessary to support a longer maximum sentence under the federal guidelines must be proved to a jury or admitted as part of a guilty plea. *Id.* at 225–26.

More importantly to the issue before this Court, a different five justice majority, composed of Chief Justice Rehnquist and Justices Breyer, O'Connor, Kennedy, and Ginsburg, concluded that the appropriate remedy for the constitutional problem was to excise the language in 18 U.S.C. § 3553(b)(1) that made imposition of a guideline sentence mandatory by the district courts and the language in 18 U.S.C. § 3742(e) that provided for de novo review of sentences outside the guideline range. *Booker*, 543 U.S. at 226. The second majority also concluded that the guidelines should be retained, but they would be advisory rather than mandatory. *Id.*

The second majority's decision, effectively making the sentencing guidelines advisory, engendered dissenting opinions from Justices Stevens, Scalia, and Thomas. Justice Stevens emphasized that because there was no need to invalidate § 3553(b)(1) or § 3742(e) to avoid

violations of the Sixth Amendment in the administration of the guidelines, "[t]he Court's decision to do so represents a policy choice that Congress has considered and decisively rejected." *Booker*, 543 U.S. at 272 (Stevens, J., dissenting). That is, by making the guidelines mandatory, Congress chose to emphasize national uniformity in sentencing for similarly situated defendants over the discretion of individual judges. Indeed, as discussed above, creating greater uniformity in sentencing was Congress's principle objective in adopting the guidelines. By removing the language that made the guidelines mandatory, the Court, in Justice Stevens' view, unnecessarily substituted its own policy preference for Congress's policy preference. *Id.* at 272–74.

Justice Stevens reviewed the legislative history of the Sentencing Reform Act and later legislation and contended that the Court's decision to emphasize the power of the sentencing judge to make sentencing decisions over retaining the mandatory nature of the guidelines was "remarkable" and even "absurd." *Id.* at 297–98. Justice Stevens emphasized that several senators believed that the broader problem they were attempting to remedy—sentencing disparities—had a very specific cause—too much judicial discretion. *Id.* One senator noted the "failure" of federal judges to impose consistent sentences; another lamented, "[y]ou cannot trust a judge . . . you must not trust a judge." *Id.* (quoting 130 Cong. Rec. 973, 976 (1984)). By making the guidelines merely advisory and returning substantial discretion to individual judges, Justice Stevens believed that the Court was directly contradicting the intent of the reform statute.

Justice Scalia, although unwilling to rely on legislative history to support his conclusion, agreed that the Court's chosen remedy for the Sixth Amendment problem hindered Congress's primary objective of avoiding disparate sentences. *Id.* at 303 (Scalia, J., dissenting). Justice Scalia excoriated the Court for "tak[ing] as the North Star of its analysis the fact that Congress enacted a

'judge-based sentencing system.' " *Id.* He continued:

> That seems to me quite misguided. Congress did indeed expect judges to make the factual determinations to which the Guidelines apply, just as it expected the Guidelines to be mandatory. But which of those expectations was central to the congressional purpose is not hard to determine. No headline describing the Sentencing Reform Act of 1984 (Act) would have read "Congress reaffirms judge-based sentencing" rather than "Congress prescribes standardized sentences." Justice Breyer's opinion for the Court repeatedly acknowledges that the primary objective of the Act was to reduce sentencing disparity. Inexplicably, however, the opinion concludes that the *manner* of achieving uniform sentences was more important to Congress than actually achieving uniformity—that Congress was so attached to having *judges* determine "real conduct" on the basis of bureaucratically prepared, hearsay-riddled presentence reports that it would rather lose the binding nature of the Guidelines than adhere to the old-fashioned process of having *juries* find the facts that expose a defendant to increased prison time. The majority's remedial choice is thus wonderfully ironic: In order to rescue from nullification a statutory scheme designed to eliminate discretionary sentencing, it discards the provisions that eliminate discretionary sentencing.

*Id.* at 303–04 (citations and footnote omitted). Justice Scalia emphasized that by removing the provisions from § 3553(b)(1) that generally made imposition of a guideline sentence mandatory on the district court, the Court "authoriz[ed] the [sentencing] judge to apply his own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the Guidelines." *Id.* at 305. The result would be increased disparity in sentencing, not less.

Moreover, Justice Scalia suggested that the Court's tinkering with the appellate review provisions in § 3742(e) transformed a provision designed solely as a mechanism for enforcing conformity with the guidelines, *id.* at 306, into an avenue for appellate courts to review a district court's exercise of sentencing discretion, *id.* at 308.[1] In doing so, the Court abandoned its

---

[1] The statute provides:

(e) Consideration. – Upon review of the record, the court of appeals shall

-13-

"tradition" of deference to district courts in sentencing matters, *id.* at 307–08, and added yet another layer of discretion to the sentencing system.  This was discretion that, in Justice Scalia's view, would further contribute to increased disparity in federal sentencing.  *Id.* at 310–12.  Justice Scalia concluded that the "unreasonableness" standard of review invented by the Supreme Court in *Booker*, would "produce a discordant symphony of different standards, varying from court to court and judge to judge, giving the lie to the remedial majority's sanguine claim that 'no feature' of its avant-garde

---

        determine whether the sentence–
            (1) was imposed in violation of law;
            (2) was imposed as a result of an incorrect application of the sentencing guidelines;
            (3) is outside the applicable guideline range, and
                (A) the district court failed to provide the written statement of reasons required by section 3553(c);
                (B) the sentence departs from the applicable guideline range based on a factor that–
                    (i) does not advance the objectives set forth in section 3553(a)(2); or
                    (ii) is not authorized under section 3553(b); or
                    (iii) is not justified by the facts of the case; or
                (C) the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence, as set forth in section 3553(a) of this title and the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or
            (4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.
The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

18 U.S.C. § 3742(e).

Guidelines system will 'ten[d] to hinder' the avoidance of 'excessive sentencing disparities.' " *Id.* at 312.

Post-*Booker*, the appellate courts and district courts have struggled to define just how "advisory" the guidelines were meant to be. Courts have, for example, located methodological deficiencies in creating a guideline and concluded the deficiency justified judicial variance. In *Kimbrough v. United States*, 552 U.S. 85 (2007), the defendant was convicted of distributing 56.1 grams of crack cocaine, 92.1 grams of powder cocaine, and a firearm offense. *Id.* at 92. The guidelines reflect a sentencing range of 168 to 210 months on the drug charges, plus a consecutive sentence of 60 months on the firearm charge for a total of 228 to 270 months. *Id.* The drug offense guideline was premised on the defendant's responsibility for 56.1 grams of crack. *Id.* at 92–93. Had the guideline range been premised on a similar amount of powder cocaine, the guideline range, inclusive of the 60-month firearm sentence, would have been 97 to 106 months. *Id.* at 93. The sentencing court concluded that the statutory minimum, 180 months, was long enough to accomplish the § 3553(a) objectives and imposed a 180-month sentence. *Id.* The government appealed and the Fourth Circuit vacated the sentence, 174 F. App'x 798, 799 (2006), but the Supreme Court granted certiorari and affirmed the district court's sentencing decision, 552 U.S. at 110.

The Supreme Court concluded that the defendant's 180-month sentence was "reasonable" based on the nature of the offense, the defendant's history and characteristics, and the fact that the "unwarranted disparity" between offenses involving crack cocaine and offenses involving powder cocaine suggests that a guideline sentence would be greater than necessary to achieve the § 3553(a)(2) objectives. *Kimbrough*, 552 U.S. at 110–11. The Court emphasized that the "ultimate question" is always "whether the sentence was reasonable." *Id.* at 111. The Court noted that the

government did not even contest the reasonableness of the sentence beyond its assertion that the sentencing ratio assigned by the commission to crack cocaine compared to powder cocaine was mandatory. *Id.*; *see also Spears v. United States*, 128 S.Ct. 840 (2009) (per curiam) (vacating 8th Circuit opinion and remanding in light of *Kimbrough*).

It is worth emphasizing that the 100-to-1 ratio in crack cocaine sentences compared to powder cocaine sentences provided for by the guidelines was not based on the Sentencing Commission's policy preferences. Rather, the basis for the difference arose from Congress's 100-to-1 disparity in the mandatory minimum sentences for trafficking in those drugs. *See* 21 U.S.C. § 841(b)(1)(A)–(B). Accordingly, the policy questioned by the *Kimbrough* Court was not the Commission's policy but the Commission's effort to interpret and apply Congress's policy.

In *United States v. Camacho-Arellano*,--- F.3d --- No. 07-5427, 2010 WL 2869394 (6th Cir. July 16, 2010), the Sixth Circuit Court of Appeals extended *Kimbrough* to provide district courts with discretion to vary from the guidelines based on policy disagreements. In *Camacho-Arellano*, the Defendant was convicted of reentering the United States after being deported without the permission of the Attorney General in violation of 8 U.S.C. § 1326(a)(2) and received a guideline sentence of 57 months in prison. *Id.* at *1. Camacho-Arellano argued before the district court that he was entitled to a downward variance on "disparity" grounds because sentences imposed on similar offenders pursuant to "fast-track" programs that are utilized in border states are often substantially shorter. *Id.* at *3–6. As the sentencing judge had in *Kimbrough*, the district judge rejected the argument concluding that judges are not empowered to vary from the guidelines based on their own disagreements with guidelines policy. *Id.* The Sixth Circuit vacated the sentence and remanded for reconsideration in light of *Kimbrough*.

*Kimbrough* can be read narrowly to suggest that district courts may consider the well-documented and often-criticized disparity between crack cocaine guidelines and powder cocaine guidelines as one factor in granting a variance under § 3553(a). The Sixth Circuit in *Camacho-Arellano*, however, endorsed a reading of *Kimbrough* that vests district judges with discretion to grant a variance based on reference to the more lenient "fast-track" programs utilized in border states. *Id.* at *5–6.

## III

Returning to the task at hand in this case, requiring this Court to explain why it did *not* grant a guideline variance, seems to go well beyond *Booker*, *Kimbrough*, and *Camacho-Arellano*. Defendant Wallace "argues" that she should be treated more leniently than she was but she does not dispute the United States' guideline application to her circumstance. No argument is advanced that the applicable guidelines are flawed, as with the crack cocaine guidelines in *Kimbrough*, or produce a disproportionate result by comparison to the fast-track provisions at issue in *Camacho-Arellano*. Raising the question of why a variance should not be granted from a guideline sentence is all the more extraordinary when the rationale for the variance offered by the Defendant, sentencing "disparity," is considered. Congress's central concern in adopting the Sentencing Reform Act of 1984 was to reform the disparities in similarly situated defendants' offense and criminal history circumstances. Justice O'Connor's fear that "[o]ver 20 years of sentencing reform are all but lost," *Blakely*, 542 U.S. at 326, is born out by remanding Defendant Wallace's case for resentencing to consider Defendant Wallace's argument that her guideline sentence produces a disparate result when no flaw in the guidelines is even alleged.

This Court may have an opinion, say, that the two-level increase for Defendant Wallace's

perjury overstates the sentence that is "necessary" for correctional purposes because her desire to return to her children is significant enough to assure future good behavior. This Court's opinion, however, is the opinion of a single judge and adopting that rationale for a more lenient sentence for Defendant Wallace in contrast to a defendant who does not or cannot have children would directly conflict with the Sentencing Commission's adoption of U.S.S.G. §5H1.6 ("[F]amily ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted.") and Congress's intent in establishing the Commission. Moreover, this Court's subjective assessment of Defendant Wallace to assign a single-level, a two-level, or a three-level reduction to this rationale is essentially unreviewable on appeal. Indeed, being directed to explain why a guideline variance is not justified based upon sentencing disparity is an invitation to reject the Commission's efforts at sentencing reform and the express will of Congress reflected by the Sentencing Reform Act of 1984. As Justice Steven explained, it is also an invitation to entertain a challenge to the judiciary's willingness to be true to congressional intent. *Booker*, 543 U.S. 297–98.

For the reasons explained at the sentencing hearing on August 10, 2010, as supplemented by this Sentencing Memorandum, Defendant Wallace was sentenced to a term of 78 months on each of Counts 1 and 5, 48 months on Counts 2 and 4, and 60 months on Counts 6 and 7. This Court was satisfied that the sentence was "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2).

                                                 s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

Dated: October 5, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 5, 2010.

                                        s/Tracy A. Jacobs
                                        TRACY A. JACOBS